**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA**,

      Plaintiff,

vs.                                                          Cr. No. 06-495 MCA

**YAFET TORRES GUERRERO,**

      Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant Yafet Torres Guerrero's *Motion to Suppress Evidence* [Doc. 22], filed May 22, 2006.  The Court held a hearing on the motion on July 3, 2006.  Having considered the parties' submissions, the relevant law, the arguments of counsel, and otherwise being fully advised in the premises, the Court denies the motion.

**I.**      **FINDINGS OF FACT**

      1.      Officer Arcenio Chavez has been a trooper with the New Mexico State Police ("NMSP") for six years and in law enforcement for approximately eight years.

      2.      As part of his law enforcement training, Officer Chavez has been trained in identifying the odor of narcotics, how narcotics are transported, and how they are packaged.

      3.      Officer Chavez has taken classes in which he learned how to identify certain

        indicators of narcotics trafficking. These indicators include nervousness, conflicting stories, and questionable purpose of the trip.

4. Officer Chavez also is trained in recognizing masking agents commonly used to hide the scent of narcotics.

5. In his eight years as a law enforcement officer, Officer Chavez has participated in approximately 55 narcotics seizures.

6. Officer Chavez has attended K-9 training, working one-on-one with an instructor to learn how a police dog will indicate and alert to the scent of narcotics such as marijuana, cocaine, methamphetamine, and heroin.

7. At the suppression hearing, Officer Chavez testified that his dog, Chica, will demonstrate an *indication* by sitting and will demonstrate an *alert* by bobbing her head, wagging her tail more quickly than usual, and breathing more heavily than she normally would.

8. Officer Chavez and Chica have worked together for approximately three and one-half to four years.

9. On February 16, 2006, Officer Chavez was monitoring westbound Interstate 40 between mile markers 134 and 135 west of Albuquerque, New Mexico when he noticed a black Dodge Intrepid that he determined was following too closely behind the commercial vehicle in front of it.

10. Officer Chavez testified that the Intrepid was approximately one car length behind the commercial vehicle and that it did not "fall back" at any time.

11. At the time he noticed what he determined to be a traffic infraction, Officer Chavez was not able to see the occupants of the vehicle.

12. Officer Chavez, who was in uniform and in his marked police unit, stopped the Intrepid at around 7:40 a.m. [Exh. 2, "State of New Mexico Uniform Traffic Citation"].

13. Conditions at the time of the traffic stop included medium traffic, clear weather, and dry roads. It was light at the time of the stop. [Id.].

14. Officer Chavez approached the Intrepid and its occupants from the passenger's side of the vehicle.

15. As Officer Chavez was approximately one to two car lengths behind the Intrepid, he detected an overwhelming fruity scent emanating from the car.

16. While approaching the vehicle, he also noticed two fire extinguishers mounted inside on the rear deck of the Intrepid. [See Exhs. 3-C, 3-D].

17. At the suppression hearing, Officer Chavez explained that these fire extinguishers were held in place by brackets in an area just above the trunk and against the rear window.

18. Officer Chavez testified that he had never seen fire extinguishers mounted in that fashion.

19. When he reached the Intrepid, Officer Chavez informed the driver, Defendant Yafet Torres Guerrero, that he had been stopped for following too closely behind a commercial vehicle.

20. Officer Chavez informed Defendant that for every ten miles per hour he traveled over the speed limit, he should be one car length behind the vehicle in front of him, and even more if the vehicle in front of him was a truck.

21. Officer Chavez, speaking English, then asked for Defendant's license and proof of insurance and registration.

22. Defendant complied with this command and removed his registration and insurance from the glove compartment.

23. Officer Chavez also noticed air fresheners mounted to the Intrepid's air vents.

24. In response to Officer Chavez's request for documentation, Defendant handed him an Oregon driver's license and proof of insurance and registration showing the Intrepid was insured by and registered to an individual named Juana Espinosa, a resident of Arizona. [See Exhs. 4, "AZ DOT Title Registration Application" and Exh. 5, "Arizona Automobile Insurance Card"].

25. Officer Chavez noticed that as he spoke to Defendant, Defendant's hands and legs shook.

26. Defendant was traveling with a passenger and Officer Chavez noticed that the passenger's legs were shaking.

27. Officer Chavez also testified, however, that the traffic stop occurred on a cold morning and that it is possible to mistake shivering for nervousness.

28. Officer Chavez then had Defendant step out of the car and move back near his patrol unit, where he began asking Defendant questions about the owner of the

Intrepid and Defendant's travel plans.

29. Defendant first identified Juana Espinosa as his wife, then as his pregnant girlfriend and explained that, although the couple was separated, she had allowed him to borrow the Intrepid.

30. Defendant also told Officer Chavez that he was traveling to Albuquerque, New Mexico from Phoenix, Arizona on a one-day trip to buy a Ford Focus.

31. Defendant identified his passenger, Salvador Elias-Ramirez, as a mechanic.

32. Although a minimal part of the conversation between Officer Chavez and Defendant took place in Spanish, the bulk occurred in English.

33. The videotape from Officer Chavez's patrol unit discloses, for example, Officer Chavez questioning Defendant in English about his wife's name and asking Defendant in English to do such things as step out of his vehicle or wait in a specified area, and Defendant responding appropriately. [Exh. 1, Videotape of Feb. 16, 2006 traffic stop].

34. At the hearing, Officer Chavez testified as to his belief that he and Defendant understood each other throughout their conversation. He also testified that at no time during their conversation did Defendant indicate that he did not speak English or that he did not understand Officer Chavez. By contrast, Officer Chavez testified that Defendant's passenger was unable to understand English at all so Officer Chavez spoke Spanish to him.

35. Officer Chavez issued Defendant a warning citation for following too closely

behind a commercial vehicle and returned his documents to him.

36. At this point, Defendant then began walking back to his car, at which point Officer Chavez asked if he could ask Defendant a few questions.

37. Defendant assented, and Officer Chavez began asking more questions about Defendant's wife, his trip to Albuquerque, and whether he had any tools in the vehicle, as Defendant had represented that his passenger was a mechanic and they were traveling to Albuquerque to purchase a car.

38. Defendant responded that he had no tools in the car.

39. Officer Chavez then asked Defendant to open the trunk.

40. In the trunk were no tools and no clothes, but only a speaker box.

41. Officer Chavez then asked if he could run his dog, Chica, around the exterior and interior of the Intrepid, to which Defendant replied, "That's fine."

42. Chica alerted to the backseat area of the vehicle by sniffing hard and panting heavily.

43. Chica did not alert to the fire extinguishers mounted in the back of the Intrepid.

44. Officer Chavez testified that Chica does not always alert to the place where narcotics are ultimately found but, instead, depending on winds and weather, to the area from which the odor of narcotics emanates.

45. Officer Chavez informed Defendant that Chica had alerted to the odor of narcotics and requested Defendant's consent to search.

46. Officer Chavez testified that he then presented Defendant with a *Consent to Search* form. This form appears to bear Defendant's signature. [See Exh. 6, "New Mexico State Police Consent to Search Form"].

47. At the suppression hearing Defendant disputed that the signature on the form is his. The Court finds that Defendant's testimony in this regard is not credible.

48. Defendant also testified that he told Officer Chavez he could search the Intrepid.

49. Officer Chavez began his search in the backseat area of the vehicle.

50. The search took place on the side of Interstate 40, with medium traffic passing by. At no time did Officer Chavez unholster his weapon or raise his voice. He touched Defendant only for the purpose of patting him down for weapons.

51. During his search, the two fire extinguishers again caught Officer Chavez's attention.

52. Officer Chavez discharged one of the fire extinguishers, quickly emptying it.

53. Officer Chavez testified that when he shook the now-empty fire extinguisher, he could hear something moving inside.

54. Officer Chavez acknowledged that he is not familiar with the length of time a fire extinguisher remains charged but opined that, because "[u]sually it sprays out for a while to put out a fire . . . , there should be more contents coming out than just one use."

55. Officer Chavez testified, and the videotape of the traffic stop confirms, that at some point during the search, a Laguna Acoma police officer arrived and watched Defendant and passenger Salvador Elias-Ramirez.

56. Officer Chavez continued to search the vehicle and discovered an altered, empty compartment built of sheet metal in the rear bumper.

57. At that point, Officer Chavez asked Defendant to follow him back to his NMSP office in Albuquerque, which Defendant did.

58. While Defendant waited at a restaurant across the street from Officer Chavez's office, Officer Chavez opened the fire extinguishers and discovered a plastic bag inside.

59. The contents of the plastic bag field-tested positive for heroin.

60. Defendant was then brought over to the NMSP office where he was arrested and subsequently interviewed by Sergeant Miguel Mendez of the narcotics division, a 15-year employee of the NMSP.

61. Sergeant Mendez understood Defendant to be more comfortable speaking Spanish, so he conducted his interview in Spanish. Sergeant Mendez did not understand Defendant to speak no English.

62. Sergeant Mendez presented Defendant with a Spanish-language *Advice of Rights* form and Defendant initialed each paragraph of the form before signing and printing his name at the bottom. [See Exh. 7].

63. Sergeant Mendez testified that Defendant then explained that he had been

        approached in an Arizona mall and asked to transport to Albuquerque something he suspected to be drugs. Defendant expected to use the altered compartment in the Intrepid to conceal his payment on the trip back to Arizona.

64. Sergeant Mendez asked Defendant if he would participate in a controlled delivery of the heroin, but Defendant declined.

65. On March 8, 2006, Defendant was charged with unlawfully, knowingly, and intentionally possessing with intent to distribute one kilogram and more of a mixture containing heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). [Doc. 9].

## II.   LEGAL ANALYSIS AND CONCLUSIONS OF LAW

On May 22, 2006, Defendant filed a *Motion to Suppress Evidence* seeking to suppress all evidence obtained and/or derived from evidence obtained from the February 16, 2006 search of the Intrepid, as well as any statements made by him subsequent to that search. [Doc. 22]. As grounds for his motion, Defendant argues that (1) the initial stop for following too closely was pretextual and invalid under the Fourth Amendment, and (2) Officer Chavez's continued questioning after returning Defendant's driver's license and registration was not premised on a reasonable suspicion of illegal activity or consented to by Defendant. [See generally Doc. 23].

### A. The Fourth Amendment

The Fourth Amendment protects the "right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'" United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998) (*quoting* Delaware v. Prouse, 440 U.S. 648, 653 (1979). Since an ordinary traffic stop is analogous to an investigative detention, the Court analyzes such a stop under the principles pertaining to investigatory detentions set forth in Terry v. Ohio, 392 U.S. 1 (1968). United States v. Tibbetts, 396 F.3d 1132, 1136 (10th Cir. 2005). To determine the reasonableness of an investigative detention, the Court conducts a two-part inquiry, asking first whether the officer's action was justified at its inception, and, second, whether it was reasonably related in scope to the circumstances which justified the interference in the first place. Hunnicutt, 135 F.3d at 1348.

In a routine traffic stop, an officer may request a driver's license, vehicle registration and other required papers, run necessary computer checks, and then issue any warning or citation. United States v. Gregoire, 425 F.3d 872, 879 (10th Cir. 2005). Once those tasks are completed, however, a driver must be allowed to proceed on his way unless (1) reasonable suspicion exists that the driver is engaged in criminal activity, or (2) the driver consents to additional questioning. Id. In this case, Defendant challenges both the initial stop and the questioning that occurred after Officer Chavez had returned his driver's license and insurance and registration.

### 1. Whether the Initial Traffic Stop was Lawful

Defendant first argues that the initial stop for following too closely was "invalid under

the Fourth Amendment as an entirely arbitrary exercise of discretionary police power more than likely based on racial profiling." [Doc. 23 at 5]. Defendant also challenges Officer Chavez's failure to make any attempt to justify the stop, specifically, the failure to include in his incident report facts tending to show (1) how closely Defendant was traveling to the vehicle in front of him, (2) how fast the other vehicle was traveling, or (3) the traffic upon or condition of the highway. [Id. at 6].

The initial stop is supportable so long as Officer Chavez had "a reasonable articulable suspicion that a traffic or equipment violation ha[d] occurred or [was] occurring." Hunnicutt, 135 F.3d at 1348. Indeed, one proposition for which Hunnicutt stands is that "[Tenth Circuit] cases make clear that the government need not show a violation actually occurred to justify an initial traffic stop." Id. Moreover, "[i]t is irrelevant that the officer may have had other subjective motives for stopping the vehicle." Id. Instead, the sole inquiry "is whether the particular officer had reasonable suspicion that the particular motorist violated 'any . . . of the multitude of applicable traffic and equipment regulations' of the jurisdiction." Id. (*quoting* Prouse, 440 U.S. at 661); see also Gregoire, 425 F.3d at 876-879 (stop justified at inception where it was based on trooper's observed failure of driver to signal before merging into highway traffic).

In this case, Officer Chavez stopped Defendant for following too closely behind the vehicle in front of him. [Exh. 2]. Following too closely is a violation of a New Mexico state

11

statute codified at NMSA § 66-7-318(A).[1] Thus, whether, as Defendant contends, Officer Chavez had other reasons for stopping Defendant is irrelevant as long as he had a reasonable suspicion that Defendant was violating a New Mexico traffic regulation.  See Hunnicutt, 1354 F.3d at 1348; see also United States v. Vercher, 358 F.3d 1257 (10th Cir. 2004) (officer's reasonable suspicion that driver following too closely, in violation of Kansas statute worded identically to that of NMSA § 66-7-318(A), sufficient to justify traffic stop); United States v. Dominguez-Cruz, 2006 WL 1166138, at *2 (10th Cir. May 03, 2006) (same, where statute at issue was Oklahoma traffic statute worded identically to NMSA § 66-7-318(A)).  Additionally, notwithstanding Defendant's assertion that the initial stop was "more than likely based on racial profiling[,]" the credible and undisputed suppression-hearing testimony revealed that, when he first noticed the Intrepid following the commercial vehicle, Officer Chavez was unable to see the Intrepid's occupants.  The Court concludes that Officer Chavez's action in stopping Defendant was justified at its inception.  See Hunnicutt, 135 F.3d at 1348.

The Court also finds that the detention that took place prior to the return of Defendant's driver's license and registration was reasonably related in scope to the circumstances which justified the interference in the first place.  See Hunnicutt, 135 F.3d at 1348.  Once stopped, Officer Chavez questioned Defendant about Defendant's having been

---

[1] Section 66-7-318 provides, in pertinent part, that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.  NMSA § 66-7-318(A).

12

following too closely behind the vehicle in front of him; asked about the owner of the car and her whereabouts; and asked Defendant about his travel plans. It is well-established that during a traffic stop, an officer may ask routine questions about the driver's travel plans. United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005); see also United States v. Williams, 271 F.3d 1262, 1267 (10th Cir. 2001) ("[W]e have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop."). The Court concludes that, in asking the questions he asked during this routine traffic stop, Officer Chavez did not exceed the scope of the stop.

### 2. Whether Officer Chavez's Additional Questioning of Defendant was Consented to by Defendant or Premised on Reasonable Suspicion of Illegal Activity

Defendant next argues that, once Officer Chavez returned his driver's license and insurance and registration, further questioning was in violation of the Fourth Amendment because Officer Chavez had no reasonable suspicion of illegal activity and because the initial detention had not turned into a consensual encounter. [Doc. 23 at 6-12]. Generally, if a driver produces a valid license and proof of right to operate the vehicle, the detaining officer must allow him to continue on his way without delay for further questioning. United States v. Cervine, 347 F.3d 865, 871 (10th Cir. 2003). The officer may, however, extend the detention for reasons unrelated to the traffic stop if (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention has become a consensual encounter. Id. (internal quotations omitted). The Court concludes that the extended detention in this case was lawful because at the time

Officer Chavez began posing his second set of questions, the initial detention had become a consensual encounter.  Alternatively, Officer Chavez had an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring.

### a. Whether Defendant Consented to Additional Questioning

"A consensual encounter is voluntary cooperation with law enforcement in response to non-coercive questioning."   Gregoire, 425 F.3d at 879.  "The government bears the burden of proving voluntary consent based on the totality of the circumstances." Id.  The Government must (1) show through clear and positive testimony that the consent was unequivocal and specific, and freely and intelligently given, and (2) establish that consent was given without duress or coercion.  United States v. Corral, 899 F.2d 991, 994 (10th Cir. 1990).[2]  In Gregoire, factors that persuaded the Tenth Circuit that the defendant voluntarily consented to additional questioning included that the detaining officer's request to ask additional questions came in full daylight, on the open road, and with no physical restraint or intimidation of the defendant.  Id.

In this case, the timer on the video recorder mounted in Officer Chavez's patrol unit shows that Officer Chavez initiated the traffic stop in question at 7:40 a.m.  A viewing of the tape of the stop reveals that it was sunny and light as Officer Chavez stopped Defendant and

---

[2] Because Defendant argues that the initial stop was illegal, he has urged the Court to hold the Government to a higher standard of proving consent and require it to show that his alleged act of giving consent was "sufficiently an act of free will to purge the primary taint." United States v. Sanchez-Valderuten, 11 F.3d 985, 990 n.4 (10th Cir. 1993) (internal quotations omitted).  The Tenth Circuit has declined to apply this higher standard in cases where it has determine that the initial stop was lawful.  See id.  Because this Court has determined that the initial stop was lawful, this Court also declines to apply the higher standard urged by Defendant.

approached the Intrepid to speak with the occupants. The tape also shows that Officer Chavez's additional questioning of Defendant took place on the side of the road, I-40, where Defendant had been pulled over. A steady flow of interstate traffic also is apparent from the tape. Credible evidence adduced at the suppression hearing (further supported by the videotape of the incident) established that Officer Chavez never unholstered his weapon and did not raise his voice at any time. There has been no allegation that Officer Chavez physically restrained Defendant, though Officer Chavez explained that he touched Defendant once, for the purpose of patting him down for weapons. Additionally, a Laguna Acoma police officer was present during the search. These factors lead the Court to conclude that Defendant's consent to the search was voluntary. See United States v. Ledesma, 447 F.3d 1307, 1314 (10th Cir. 2006).[3]

Finally, although Defendant at the suppression hearing testified that the signature on the *Consent to Search* form presented to him by Officer Chavez is not his, he nevertheless conceded that he told Officer Chavez that he could search the Intrepid.[4] In light of this

---

[3] In Ledesma, the Tenth Circuit explained that factors that suggest that an encounter was not consensual include (1) the threatening presence of several officers; (2) use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; (3) prolonged retention of a person's personal effects, such as identification, (4) the absence of other members of the public; and (4) the officer's failure to advise the defendant that he or she is free to leave. On the other hand, factors tending to show that an encounter was consensual include (1) an officer's pleasant manner and a tone of voice that is not insisting; (2) that the encounter took place in a public location, such as the shoulder of an interstate highway, and in public view; and (3) the prompt return of the defendant's identification and papers. Ledesma, 447 F.3d at 1314.

[4] The following exchange took place between the Assistant United States Attorney and Defendant, with the assistance of the Court's Spanish-language interpreter:

concession, as well as what is apparent from the tape taken from Officer Chavez's video recorder, the Court concludes that Defendant's consent was unequivocal and specific, and given freely and intelligently without duress or coercion.

The Court also rejects Defendant's contention that he "speaks virtually no English, and could not have voluntarily given his consent for this reason alone." [Doc. 23 at 11]. In Sanchez-Valderuten, the Tenth Circuit held that it was not clear error for the district court to find that the defendant, a Colombian national who claimed not to understand English, did, in fact, have a sufficient command of the English language for purposes of giving consent where he (1) produced his driver's license and registration immediately upon being asked for them; (2) responded to questions concerning his travel plans by mentioning U.S. cities; (3) responded fairly quickly "Colombia" when asked in what country he was raised; and (4) provided no direct evidence at the suppression hearing that he could not understand English. In light of these findings and despite evidence that the defendant had difficulty with English, the Tenth Circuit concluded that the defendant's consent to search his vehicle was given voluntarily. Sanchez-Valderuten, 11 F.3d at 990-991.

---

Q: All right. You heard the officer ask you for permission to search the car, didn't you?
A: Yes, I understood something like that.
Q: And you told him he could?
A: Yes.
Q: And he took out a form?
A: Uh-huh.
Q: But you're saying it's not this form, government's Exhibit 6 [the *Consent to Search* form apparently bearing Defendant's signature]?
A: No, it wasn't this one.

At the suppression hearing in this case, Defendant testified with the assistance of the Court's Spanish interpreter. The hearing, therefore, did not allow the Court to assess Defendant's mastery of the English language. Contra United States v. Corral, 899 F.2d 991, 994 (10th Cir. 1990) (upholding search as consensual where, among other things, district court made its own observation of defendant's ability to understand English based on its observation of defendant's conduct at suppression and concluded that defendant "had a working knowledge of English"). The tape of the traffic stop as recorded on Officer Chavez's video camera, however, reveals that the conversation between Officer Chavez and Defendant took place primarily in English and that, when Officer Chavez, in English, posed questions or asked Defendant to do something, Defendant responded appropriately. For example, the videotape shows that when Officer Chavez asked Defendant, in English, to exit the Intrepid, Defendant did so. When Officer Chavez, again in English, asked Defendant to wait by the front end of his patrol car, Defendant complied. Finally, when Officer Chavez asked, in English, for Defendant's name, Defendant provided it. Consequently, the Court concludes that Defendant has a working knowledge of the English language, see id., and understood Officer Chavez's commands and directions. The Court rejects Defendant's argument that because he "speaks virtually no English, [he] could not have voluntarily given his consent for this reason alone." [Doc. 23 at 11].

**b. Whether Officer Chavez's Additional Questioning of Defendant was Premised on a Reasonable Suspicion of Illegal Activity**

In the alternative, the Court concludes that the extended detention of Defendant was

17

lawful because Officer Chavez had an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring. When determining whether reasonable suspicion exists, the Court looks to the totality of the circumstances to see whether the detaining officer had a particularized and objective basis for suspecting wrongdoing. Bradford, 423 F.3d at 1157. While the Court should give deference to a law enforcement officer's ability to distinguish between innocent and suspicious actions, it must also keep in mind that inchoate suspicions and unparticularized hunches do not provide reasonable suspicion. United States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998) (internal quotations omitted).

In this case, credible suppression-hearing testimony from Officer Chavez established the existence of the following indicators of possible drug activity: an overwhelming scent of air freshener; Defendant's shaking hands and legs and passenger's shaking legs; a driver's license from one state and proof of insurance and registration from another; and conflicting explanations as to the owner of the Intrepid (wife vs. girlfriend). In addition to these indicators, Officer Chavez's curiosity was further piqued by the manner in which the fire extinguishers were mounted in the rear of the vehicle.

In considering the factors that may give rise to an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, the Tenth Circuit has held that while nervousness and its signs should not be overcounted in a totality-of-the-circumstances analysis, Bradford, 423 F.3d at 1157, extreme and continued nervousness is entitled to somewhat more weight. United States v. West, 219 F.3d 1171, 1179 (10th Cir.

2000). Additionally, "[t]he Tenth Circuit has consistently held that the scent of air freshener is properly considered as a factor in the [totality-of-the-circumstances] analysis." Id. at 1178.

Credible evidence adduced at the suppression hearing established that Officer Chavez, an 8-year veteran of law enforcement who has participated in 55 narcotics seizures, is trained in identifying indicators of narcotics trafficking. Although Officer Chavez acknowledged that the morning of the traffic stop was a cold one, and that shivering could be mistaken for nervousness, his undisputed testimony established that he noticed the Intrepid occupants' shaking hands and legs while they were still inside the vehicle. The Court concludes that the nervousness of Defendant and his passenger, when considered in conjunction with the overwhelming scent of air freshener described by Officer Chavez, the fact that Defendant produced a driver's license from one state and proof of insurance and registration from another, and that Defendant identified Juana Espinosa first as his wife and later as his girlfriend, were sufficient to allow Officer Chavez, an experienced law enforcement officer, to form an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring.

## **III.   CONCLUSION**

For the foregoing reasons, the Court concludes that the initial traffic stop of Defendant on February 16, 2006 was lawful. The Court also concludes that questioning that occurred once Defendant was issued a citation and returned his license and proof of insurance and registration was consensual. In the alternative, such questioning was premised

on the detaining officer's reasonable suspicion of illegal activity. Consequently, Defendant's motion to suppress is denied.

**IT IS, THEREFORE, ORDERED** that Defendant's *Motion to Suppress Evidence* [Doc. 22] is **DENIED**.

**SO ORDERED** this 25th day of July, 2006, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge